## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ANTHONY PAYNE, | : | CIVIL ACTION |
| | : | |
| Plaintiff, | : | |
| | : | |
| vs. | : | DOCKET NO: 2:20-cv-04651-MMB |
| | : | |
| WOODS SERVICES, INC., WOODS | : | |
| SERVICES MEDICAL PRACTICE | : | |
| GROUP, LLC, ABRAHAM KAMARA, | : | **PLAINTIFF'S RESPONSE IN** |
| JOHN DOES 1-5 and 6-10, | : | **OPPOSITION TO DEFENDANTS'** |
| | : | **MOTION TO DISMISS** |
| Defendants. | : | |
| | : | |

## I.      INTRODUCTION

Plaintiff, Anthony Payne ("Plaintiff"), by and through his undersigned counsel, hereby

submits his opposition to Defendant Woods Services, Inc.'s ("WSI"), Defendant Woods Services

Medical Practice Group, LLC's ("WSMPG") and Defendant Abraham Kamara's ("Kamara")

(collectively, "Defendants") Motion to Dismiss Plaintiff's Amended Complaint for Failure to

State a Claim ("Defendants' Motion").

Defendants' Motion, while styled as one filed under Federal Rule of Civil Procedure

12(b)(6), raises, at most, factual disputes regarding the well-pleaded allegations in Plaintiff's

First Amended Complaint ("Plaintiff's FAC"), which require full and fair discovery before the

Court can weigh the legal arguments presented in Defendants' Motion.  As demonstrated below,

the allegations and claims set forth in Plaintiff's FAC meet the pleading standards required under

Federal Rule of Civil Procedure 8(a) and 12(b)(6) ("Rule 8(a)" and "Rule 12(b)(6)",

respectively), as those standards are interpreted by the controlling guidance articulated by the

United States Supreme Court's rulings in *Ashcroft v. Iqbal,* 556 U.S. 662, 129 S.Ct. 1937 (2009)

and *Bell Atlantic v. Twombly,* 550 U.S. 544, 127 S.Ct. 1955 (2007). *See*, *e.g.*, *Phillips v. County of Allegheny,* 515 F.3d 224, 234 (3d Cir. 2008). For the reasons set forth herein, Plaintiff respectfully requests that the Court deny Defendants' Motion, in its entirety, with prejudice, and permit Plaintiff to litigate his claims without delay.

## II.    PROCEDURAL HISTORY AND FACTUAL BACKGROUND

Plaintiff initiated this action by electronically filing his original Complaint in this Court on September 22, 2020, alleging claims of interference and retaliation under the Family Medical Leave Act ("FMLA") and the Families First Coronavirus Response Act ("FFCRA"), as well as wrongful discharge under the Pennsylvania Whistleblower Law ("PWL"). *See*, *generally*, ECF Doc. No. 1 ("Plaintiff's Original Complaint"). On September 28, 2020, Plaintiff's counsel provided Defendants' counsel with copies of the Complaint and requested that Defendants waive formal service of process, which waivers Defendants provided. *See* ECF Doc. Nos. 2-4 (executed waivers of service for Defendants).

At the time of his original Complaint filing, Plaintiff had an administrative agency charge pending against Defendants with the Equal Employment Opportunity Commission ("EEOC"), dual-filed with the Pennsylvania Human Relations Commission ("PHRC"), alleging claims under the Americans with Disabilities Act ("ADA") and Pennsylvania Human Relations Act ("PHRA"). *See* ECF Doc. No. 5 (Plaintiff's FAC) at ¶ 4. On or about September 29, 2020, the EEOC issued a "right to sue" notice terminating its investigation of Plaintiff's administrative agency charge. *See id.* As no responsive pleading had yet been filed, on November 2, 2020, Plaintiff amended his original Complaint as-of-right by filing Plaintiff's FAC, reasserting his previous claims under the FMLA, FFCRA and WPL, and adding his claims under the ADA and

PHRA now that he had exhausted his administrative remedies regarding same. *See id.* at ¶ 4 and Counts VI-XII.

### a. General Allegations in the FAC

As set forth in Plaintiff's FAC, Plaintiff was employed by Defendants as a Residential Counselor from about June 2009 to on or about April 14, 2020. *See id.* at ¶ 11. At all times relevant, Plaintiff performed his duties up to or in excess of the reasonable expectations of Defendants. *See id.* at ¶ 12.

On or about March 31, 2020, Plaintiff attended a meeting at work during which his manager notified staff present that six of the patients Plaintiff had interacted directly with during his previous shift had high temperatures. *See id.* at ¶¶ 13, 15. The following day, each of these six patients tested positive for COVID-19. *See id.* at ¶ 14. On or about April 2, 2020, Plaintiff spoke with his doctor regarding his exposure to these patients, and Plaintiff's doctor advised that Plaintiff should get tested for COVID-19 and quarantine for fourteen days, staying home from work. *See id.* at ¶ 16. Plaintiff relayed his doctor's advice to Defendants, and was told that he could obtain a test for COVID-19 at work, which Plaintiff did on April 6, 2020. *See id.* at ¶¶ 17-18. The following day, April 7, 2020, Defendants' Nurse Practitioner informed Plaintiff that he had tested positive for COVID-19, that Plaintiff must self-quarantine for the next fourteen days and that the Nurse Practitioner would contact Plaintiff again at the end of the fourteen-day period. *See id.* at ¶ 19.

The fourteen-day quarantine period instructed by both Plaintiff's doctor and Defendants' Nurse Practitioner was consistent with the existing guidance from the Centers for Disease Control ("CDC") as well as Executive Orders and guidance promulgated by Governor Wolf and Secretary of the Department of Health for the Commonwealth of Pennsylvania regarding

exposure to and positive tests for COVID-19. *See id.* at ¶¶ 23-24. Despite this medical advice and existing guidance and orders of the CDC, Governor Wolf and Secretary Levine, on or about April 13, 2020, only six days after Plaintiff's positive test for COVID-19, Defendant Kamara called Plaintiff and told him that he needed to report for work, and that if Plaintiff did not so report, his absence would be considered a call-out. *See id.* at ¶¶ 20, 22.

Plaintiff responded to Defendant Kamara that he could not report for work as he had only tested positive six days before, and had been instructed by the Nurse Practitioner to quarantine for fourteen days, which was also the guidance issued by the CDC. *See id.* at ¶ 23. The following day, April 14, 2020, Plaintiff followed the medical advice and guidance of the CDC by not reporting to work, and Defendant Kamara called Plaintiff to notify him that he had been terminated for refusing to come to work. *See id.* at ¶¶ 24-25.

**b. ADA/PHRA Allegations in the FAC**

At all times relevant following his positive test for COVID-19, Plaintiff was a "qualified individual with a disability" as that phrase is defined with the ADA and PHRA. *See id.* at ¶¶ 26, 30. Plaintiff's positive COVID-19 diagnosis constitutes a "disability" within the meaning of the ADA and PHRA, requiring Defendants to engage in the interactive process and/or provide reasonable accommodations that would allow Plaintiff to perform the essential functions of his job. *See id.* at ¶¶ 26, 28, 30, 37-38. Plaintiff's request for leave to comply with the fourteen-day quarantine imposed by the Nurse Practitioner, guidance of the CDC and orders of Governor Wolf and Secretary Levine was reasonable *per se*. *See id.* at ¶¶ 28-29. Defendants refusal to provide this reasonable accommodation or to engage *at all* in the interactive process to identify other potential reasonable accommodations violated Plaintiff's rights under ADA and PHRA. *See id.* at ¶¶ 37-38, 40-41.

In addition or in the alternative, Defendants' termination of Plaintiff's employment was motivated, in whole or in part, by its perception of Plaintiff as disabled as a result of his medical condition and/or medically required care in quarantining following COVID-19 diagnosis.  *See id.* at ¶¶ 27, 33, 40-41.  Furthermore, as Plaintiff's request for accommodation in the form of his medically-directed quarantine constituted protected activity under the ADA and PHRA, Plaintiff's termination was additionally or alternatively motivated by his protected activity in requesting accommodation.  *See id.* at ¶¶ 28, 40-41.

### c.  FMLA/FFCRA Allegations in the FAC

At the time of Plaintiff's COVID-19 exposure and positive test at work, Plaintiff was an eligible employee within the meaning of the FMLA and FFCRA, having worked for Defendants for at least twelve months and having worked at least 1,250 hours in the previous twelve months. *See id.* at ¶ 31.  Defendants were also covered employers under the FMLA and FFCRA, having employed at least fifty employees within a 75-mile radius of Plaintiff's workplace for at least twenty workweeks in that or the previous year.  *See id.* at ¶ 32.  Despite Defendants' awareness of Plaintiff's medical condition and potential need for medical leave under the FMLA and FFCRA, indeed with their own medical staff having diagnosed Plaintiff's positive COVID-19 result and ordered his quarantine, Defendants nevertheless failed to provide Plaintiff with the mandatory notice or job-protected leave under the FMLA and FFCRA.  *See id.* at ¶¶ 17-25, 31-32.  Instead, Defendants terminated Plaintiff's employment within seven days of learning of COVID-19 diagnosis and need for medical leave, in violation of the FMLA and FFCRA.  *See id.*

In addition or in the alternative, Plaintiff's termination was motivated by his protected activity under the FMLA and FFCRA in attempting to exercise his rights thereunder, and, as such, constitutes retaliation under the FMLA and FFCRA.  *See id.* at ¶¶ 17-25, 34-35, 40-41.

### d.  PWL Allegations in the FAC

Defendants provide integrated health care services and advocacy for children and adults with disabilities in the Commonwealth of Pennsylvania.  *See id.* at ¶¶ 5-7.  Defendants' operations and services are funded by the Commonwealth of Pennsylvania and/or its subdivisions, making Defendants WSI and WSMPG "public bodies" within the meaning of the PWL.  *See id.* at ¶ 8; *Riggio v. Burns*, 711 A.2d 497, 500 (Pa. Super. 1998) (receipt of government funds made hospital a "public body under the PWL).  Plaintiff engaged in protected activity under the PWL by objecting to Defendants' directive that Plaintiff violate CDC guidance for those diagnosed with COVID-19 by breaking his quarantine merely six days after his positive test.  *See id.* at ¶¶ 23, 36, 40-41.  Defendants' termination of Plaintiff's employment was wrongful under the PWL because it was motivated, in whole in part, by Plaintiff engaging in this protected activity under the PWL.  *See id.* at ¶¶ 23-25, 36, 40-41.

### e.  Defendants' Motion

On November 25, 2020, Defendants filed the instant motion, arguing that Plaintiff's FAC, in its entirety, fails to state any legally cognizable claim, that any attempt to amend would be futile, and that this Court should dismiss Plaintiff's claims, in their entirety, with prejudice. *See* ECF Doc. No. 9.  As demonstrated in Plaintiff's FAC and argued below, Defendants' Motion should be denied, in its entirety, with prejudice, as Plaintiff's claims meet the pleading standards required under Rule 8(a) and, taken in a light most favorable to Plaintiff as they must be under a Rule 12(b)(6) analysis, entitle Plaintiff to proceed with discovery on each of his asserted claims.  Alternatively, to the extent that the Court deems any of Plaintiff's claims alleged in the FAC to be deficient, Defendants have failed to demonstrate futility such that this Court should bar Plaintiff from attempting to amend his claims to cure any potential deficiency.

## III.    LEGAL ARGUMENT

While Defendants assert that they do not intend to "downplay the seriousness of the COVID-19 pandemic, or the precautions announced by disease control specialists during the initial stages of the pandemic", Defendants' Motion asks this Court to do just that in arguing (1) that Plaintiff's COVID-19 diagnosis did not constitute a "disability" under the ADA/PHRA or a "serious health condition" under the FMLA; and (2) that Plaintiff's termination for reporting his good-faith belief that Defendants were violating CDC guidance, adopted by Pennsylvania's Governor and Secretary of the Department of Health, that individuals testing positive for COVID-19 quarantine for at least fourteen days following a positive test result, does not form the basis of wrongdoing under the PWL.

Regardless, as demonstrated below, Defendants' views on the seriousness of a COVID-19 diagnosis and the necessity of quarantining following a positive test result are neither authoritative nor in line with the relevant statutory and regulatory language or case law interpreting the ADA, PHRA, FMLA, FFCRA or PWL.

### a. Rule 12(b)(6) Standard of Review

The Federal Rules of Civil Procedure call for "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2); *accord Johnson v. City of Shelby, Miss.*, 135 S. Ct. 346, 347 (2014). A plaintiff "must plead facts sufficient to show that her claim has substantive plausibility." *Johnson v. City of Shelby*, 135 S. Ct. at 347. The United States Supreme Court has specifically held that there is no "heightened pleading standard in employment discrimination cases." *Swierkiewicz v. Sorema N. A.*, 534 U.S. 506, 512 (2002). The sufficiency of a complaint is tested by its factual allegations rather than any citation specific

laws or legal standards.  *Iqbal*, 129 S.Ct. at 1949-50 ("Rule 8 marks a notable and generous departure from the hyper-technical, code-pleading regime of a prior era").

Given the pleading standard in Federal Court, Defendants' Motion should be denied. Plaintiff's FAC satisfies the federal pleading standards of Rule 8(a), and the allegations pled therein are sufficient to state viable claims for each separate count included therein under the controlling guidelines set forth by *Iqbal/Twombly* and their progeny.

### A.    Plaintiff's FAC Sufficiently Pleads FMLA Interference

While Defendants' Motion argues that Plaintiff's FAC conclusively establishes that Plaintiff did not have a qualifying "serious health condition" under the FMLA, this argument merely repeats the Defendants' initial misapplication of the FMLA that gave rise to Plaintiff's interference claim.  The FMLA and its implementing regulations lay out detailed and mandatory obligations on the part of each the employer and employee once an employee has provided notice of his qualifying need for leave, including an employer's rights and obligations when it believes an employee's information regarding his qualifying need is deficient.  *See Hansler v. Lehigh Valley Hosp. Network*, 798 F.3d 149, 153 (3d Cir. 2015) (describing the notice and cure steps required under the FMLA); 29 U.S.C. §§ 2611(11), 2613(a); 29 C.F.R. §§ 825.102, 825.301(a)-(b), 825.305(c).  The United States Court of Appeals for the Third Circuit described these mandatory steps in detail in its recent reversal of a district court's order dismissing a plaintiff's FMLA interference claim using similar reasoning to that which Defendants urge this Court to use here (*see Hansler*, 798 F.3d at 155-56):

> A "serious health condition" is one that involves inpatient care in a hospital or "continuing treatment by a health care provider." *Id.* § 2611(11). In its implementing regulations, the Department of Labor defines "[c]ontinuing treatment by a health care provider" to include "chronic serious health condition[s]" that (i) "[r]equire[ ] periodic visits (defined as at least twice a year) for treatment by a health care provider," (ii) "[c]ontinue[ ] over an extended

period of time," and (iii) "[m]ay cause episodic rather than a continuing period of incapacity (e.g., asthma, diabetes, epilepsy, etc.)." 29 C.F.R. § 825.102.

Prior to taking leave, an employee must give her employer notice of the request for leave, "stat[ing] a qualifying reason for the needed leave." Id. § 825.301(b). An employer may require its employees to support their requests for leave with a certification issued by a health care provider. 29 U.S.C. § 2613(a). A "sufficient" medical certification must state (1) the date on which the serious health condition began, (2) the probable duration of the condition, (3) relevant medical facts, (4) a statement that the employee is unable to perform the functions of her position, (5) the dates and duration of any planned medical treatment, and (6) the expected duration of the intermittent leave. Id. § 2613(b).

While an employee seeking FMLA leave must "state a qualifying reason for the needed leave" and fulfill notice requirements, the employee "does not need to expressly assert rights under the Act or even mention the FMLA." 29 C.F.R. § 825.301(b). Instead, in "any circumstance where the employer does not have sufficient information about the reason for an employee's use of leave, the employer should inquire further of the employee ... to ascertain whether leave is potentially FMLA-qualifying." Id. § 825.301(a). In addition, an employer "shall advise an employee whenever the employer finds a certification incomplete or insufficient, and shall state in writing what additional information is necessary to make the certification complete and sufficient." Id. § 825.305(c). A certification is "incomplete" if the "employer receives a certification, but one or more of the applicable entries have not been completed." Id. A certification is "insufficient" if the "employer receives a complete certification, but the information provided is vague, ambiguous, or non-responsive." Id. If the employer determines that a certification is either incomplete or insufficient, it may deny the requested leave on the basis of an inadequate certification. But it may only do so if it has "provide[d] the employee with seven calendar days (unless not practicable under the particular circumstances despite the employee's diligent good faith efforts) to cure any such deficiency." Id.; see Hansen v. Fincantieri Marine Grp., LLC, 763 F.3d 832, 837 (7th Cir.2014) ("[T]he regulations do not authorize the employer to deny FMLA leave where the employee fails to provide a complete and sufficient certification but is not given the opportunity to cure the deficiency.").

Hansler, 798 F.3d at 153.

In Hansler, the district court had dismissed the plaintiff's interference claim after determining from the pleadings that the certification that the plaintiff had submitted was insufficient to demonstrate a "serious health condition" because it merely requested "intermittent leave at a frequency of 2 times weekly … and lasting for a probable duration of one month". Id. at 155. The district court therefore concluded that the certification, on its face, showed that the

plaintiff's condition did not require inpatient care, continuing treatment involving a period of incapacity or treatment for incapacity, as required to qualify for FMLA leave. *Id.* (citing 29 U.S.C. §§ 2611(11), 2612(a)(1)(D) and 29 C.F.R. § 825.102). In reversing the dismissal, the Third Circuit held that where an FMLA certification is insufficient, it merely triggers the employer's obligation to "advise [the] employee … what additional information is necessary to make the certification complete and sufficient" and provide at least "seven calendar days … to cure any such deficiency" as required by the "plain and mandatory language of the statue and regulations". *Hansler*, 798 F.3d at 155-56 (citing 29 U.S.C. § 2613(b) and 29 C.F.R. 825.305(c)).

Here, Defendants' interference with Plaintiff's FMLA rights was even more blatant than in *Hansler*, as Defendants here failed even to provide Plaintiff with an initial notice of his rights under the FMLA, or ever even ask Plaintiff for an initial certification demonstrating the qualifying basis of his serious health condition. *See* Plaintiff's FAC at ¶¶ 17-25, 31-32, 38-39. Plaintiff triggered Defendants' obligation to provide a notice of his rights under the FMLA when he informed them of his positive COVID-19 diagnosis, and the medical directive he was given by Defendants' Nurse Practitioner to remain home for at least fourteen days due to his condition. *See id.* at ¶¶ 17-25. Defendants *never* provided a notice of Plaintiff's FMLA rights, nor ever request that Plaintiff provide certification of his qualifying FMLA condition. *See id.* Having never requested the permitted certification, Defendants additionally failed to inform Plaintiff of any specific information needed to cure any such certification and demonstrate his qualifying FMLA condition. *See id.*

Defendants cannot now use their own failure to specify what information Plaintiff needed to provide them as a justification for denying Plaintiff his right to FMLA leave. As in *Hansler*,

where the defendant-employer ignored its requirements under the FMLA to provide the mandated notice to the plaintiff-employee regarding specific information required to certify her leave and instead terminated her, here, too, Defendants ignored their obligations under the FMLA, depriving Plaintiff of the opportunity to provide any required certification and, instead, summarily terminated his employment.  *See Hansler*, 798 F.3d at 156.

The Third Circuit's decision in *Hansler* is particularly relevant to Plaintiff's claims given the novel nature of the COVID-19 epidemic at the time Plaintiff was diagnosed on April 2, 2020. As the Third Circuit explained:

> Not only is our conclusion dictated by precedent as well as the statutory and regulatory text, but we believe the cure period makes abundant sense in this context. Faced with nascent symptoms from a yet-to-be diagnosed condition, an employee's physician may need some additional time to provide the required elements of a sufficient certification, including more specific information regarding relevant medical facts and the probable duration of the condition, the planned medical treatment, and the intermittent leave. 29 U.S.C. § 2613(b). As this case illustrates, for an employee with an emerging condition, the difference between a medical certification that supports leave and one that is deficient might be a matter of days.

*Hansler*, 798 F.3d at 158.

Faced with a diagnosis of a novel virus that has killed approximately 300,000 people in this country in less than a year and inflicted legions of serious attendant symptoms in those suffering from it, Defendants provided Plaintiff with absolutely no opportunity or information regarding what specific information they needed Plaintiff to submit to take the FMLA leave he required to treat his condition.  Accordingly, the Court should deny Defendant's Motion with respect to Plaintiff's FMLA interference claims, or, in the alternative, grant leave to Plaintiff to plead these claims with more specificity regarding his condition and/or Defendants' interference with Plaintiff's FMLA rights.

**B.      Plaintiff's FAC Sufficiently Pleads FMLA Retaliation**

Defendants' Motion with respect to Plaintiff's FMLA retaliation claim is entirely

premised on its unavailing attempt to dismiss Plaintiff's FMLA interference claim, arguing that

because Plaintiff did not demonstrate eligibility for FMLA leave (based on Defendants'

misapplication of the FMLA requirements), that Plaintiff cannot state a claim for FMLA

retaliation based on such interference.  As demonstrated above, Defendants' premise is incorrect,

and Plaintiff has sufficiently pled valid claims of interference under the FMLA based on

Defendants' failure to provide him with job-protected leave once on notice of his qualifying

need.  Under this same analysis, the Third Circuit also reversed the district court's order

dismissing the *Hansler* plaintiff's FMLA retaliation, as follows:

> The District Court dismissed Hansler's retaliation claim, finding she did not make
> a "valid" request for leave. This conclusion flowed from our holding that "firing
> an employee for a valid request for FMLA leave may constitute interference with
> the employee's FMLA rights as well as retaliation against the employee." *Erdman
> v. Nationwide Ins. Co.,* 582 F.3d 500, 509 (3d Cir.2009). The District Court
> reasoned that because her leave request was "premised upon the existence of a
> serious chronic health condition and her medical certification was a negative
> certification with respect to such a condition, [Hansler's] leave request was not a
> valid request entitling her to FMLA leave and, accordingly, may not form the
> basis for an FMLA retaliation claim." *Hansler,* 2014 WL 1281132, at *13.
>
> As we disagree with the underpinnings of this conclusion—*i.e.,* the certification
> was negative and Hansler was not entitled to benefits under the Act—we hold that
> Hansler's claim should not be dismissed at this stage. Hansler alleges she
> attempted to invoke her right to leave, she was not advised of deficiencies in her
> medical certification, she was not provided a cure period, and she was fired a few
> weeks later as a result of her leave request. Through discovery, Hansler might be
> able to show that Lehigh Valley had a retaliatory motive and that the stated reason
> for termination was pretextual. *See Lupyan v. Corinthian Colls., Inc.,* 761 F.3d
> 314, 325–26 (3d Cir.2014); *Lichtenstein,* 691 F.3d at 309–10.

*Hansler*, 798 F.3d at 159.

Just as in *Hansler*, Plaintiff's interference claims are, indeed, actionable, and, therefore,

so too is his retaliation claim for attempting to the exercise the rights with which Defendants

interfered.  Accordingly, Defendants' Motion with respect to Plaintiff's FMLA retaliation claim should be denied, or, alternatively, Plaintiff should be permitted to amend his complaint to cure any deficiencies in either his interference or retaliation pleading.

**C.     Plaintiff's FFCRA Claims Are Not Subject to the Limited Exception for "Health Care Provider" Employees**

Plaintiff's FFCRA claims are based on his articulated need for leave due to his positive COVID-19 diagnosis on April 2, 2020, and Defendants' denial of that leave and termination of Plaintiff's employment for attempting to exercise his right to such leave under the FFCRA.[1] Defendants' Motion correctly acknowledges that the FFCRA's Emergency Paid Sick Leave Act ("EPSLA") requires employers to provide paid sick leave to employees who demonstrate at least one of six qualifying conditions, including (i) that they are subject to federal, state or local quarantine or isolation orders related to COVID-19, and (ii) that they have been advised by a health care provider to self-quarantine due to concerns related to COVID-19.  *See* Defendants' Motion (ECF No. 9) at pp. 12-13; Pub. L. No. 116-127, 134 Stat. 178, 195-196 (2020) (Division E of the FFCRA, setting forth the EPSLA requirements at §§ 5101, *et seq.*); 29 C.F.R. §§ 826.10, *et seq.*

The only exception to this mandatory provision of paid sick time under EPSLA in the statute as it was enacted provides that "an employer of an employee who is a health care provider or an emergency responder may elect to exclude such employee from the application of this subsection."  *See* FFCRA, Division E at § 5102(a).  The FFCRA further provides that the term "health care provider" has the same meaning as that provided in § 101 of the FMLA.  *See*

---

[1]   Plaintiff has not brought claims related to leave required for child care, making Defendants' Motion with respect to the Emergency Family Medical Leave Expansion Act moot.

FFCRA, Division E at § 5110(4).  The FMLA's definition of "health care provider" is limited to the following two groups:

>(1) a doctor of medicine or osteopathy who is authorized to practice medicine or surgery (as appropriate) by the State in which the doctor practices; or
>
>(2) any other person determined by the Secretary [of the Department of Labor] to be capable of providing health care services.

29 U.S.C. § 2611(6)(A)-(B).

Defendants argue that, instead of this limited definition expressly incorporated into EPSLA by Congress, this Court should either apply (i) an invalid definition from a rule promulgated by the Department of Labor on April 1, 2020 (the day before Plaintiff's diagnosis), which exponentially broadened the definition of "health care provider" to include *each and every employee* of an employer who provides health care services within its scope of exclusion; or (ii) a definition promulgated by the Department of Labor on September 16, 2020, *months* after any relevant act or omission occurred in this case.  *See* Defendants' Motion (ECF No. 9) at p. 17.

Plaintiff contends that neither application of a definition that never had any legal validity, nor of a definition that did not become effective until months after the fact, would be appropriate here.  Rather, the *only* proper and effective definition of "health care provider" that applied to Plaintiff's attempt to exercise rights under EPSLA in early April 2020 was that which was set forth in EPSLA, incorporating the already existing definition of the phrase from the FMLA.

Defendants' arguments regarding retroactive application are off the mark with respect to both the controlling legal standard as well as the specific situation at hand.  Defendants' Motion attempts to use a framework for questions of retroactive application of "new laws" and "statutes", rather than the issue at hand, which is a judicial decision which struck down a

regulatory agency's rule as invalid.  As correctly referenced in Defendants' Motion, the United

States District Court for the Southern District of New York found that the Department of Labor's

April 1, 2020 rule with respect to its broadened definition of "health care provider" for the

exception to the FFCRA's paid sick leave requirement was "unambiguously" invalid by the very

terms of the statute the rule was implementing, and as such, that the Department of Labor had

exceeded its authority.  *New York v. U.S. Dept. of Labor*, --- F.Supp.3d ----, 2020 WL 4462260,

*10 (S.D.N.Y. Aug. 3, 2020).  As the Court explained in striking down this invalid definition:

> [T]he Court concludes that the statute unambiguously forecloses the Final Rule's definition. The broad grant of authority to the Secretary is not limitless. The statute requires that the Secretary determine that the employee be capable of furnishing healthcare services. It is the "person" — i.e., the employee — that the Secretary must designate. 29 U.S.C. § 2611(6). And the Secretary's determination must be that the person is capable of providing healthcare services; not that their work is remotely related to someone else's provision of healthcare services. Of course, this limitation does not imply that the Secretary's designation must be made on an individual-by-individual basis. But the statutory text requires at least a minimally role-specific determination. DOL's definition, however, hinges entirely on the identity of the employer, in that it applies to anyone employed at or by certain classes of employers, rather than the skills, role, duties, or capabilities of a class of employees.
>
> DOL nonetheless urges that its definition is consistent with the context in which the term is used. The term "health care provider," as used in the FFCRA, serves to exempt employees who are essential to maintaining a functioning healthcare system during the pandemic. See Final Rule at 19,335. A broad definition of "health care provider" operationalizes that goal, because employees who do not directly provide healthcare services to patients — for example, lab technicians or hospital administrators — may nonetheless be essential to the functioning of the healthcare system. (See Dkt. No. 25 at 28.) But that rationale cannot supersede the statute's unambiguous terms. And, in any event, **the Final Rule's definition is vastly overbroad even if one accepts the agency's purposivistic approach to interpretation, in that it includes employees whose roles bear no nexus whatsoever to the provision of healthcare services, except the identity of their employers, and who are not even arguably necessary or relevant to the healthcare system's vitality. Think, again, of the English professor, who no doubt would be surprised to find that as far as DOL is concerned, she is essential to the country's public-health response. The definition cannot stand.**

*New York*, 2020 WL 4462260 at *10 (emphasis added).

Defendants' request that this Court apply an invalid regulatory definition that exceeded the authority of the administrative body promulgating it, rather than the enacted statutory language and clear definition that was already well-known under the existing FMLA, is not required by any controlling legal principle of retroactivity, nor would it comport with notions of justice or equity to do so.  The DOL never had the authority to broaden the rule's definition as it did, making such broad definition void *ab initio*.  On the other hand, there was clear, established statutory language in place, which employers and employees have relied upon for years under the FMLA, which provides this Court with the proper definition both in effect and valid at the actual time that Plaintiff's claims arose.

Moreover, Defendants' argument regarding EPSLA's exception, and whether Plaintiff properly fits within such exception, appears inappropriate as a matter to determine at the pleading stage.  Plaintiff's title was "Residential Counselor", however, Defendants ask this Court to make factual determinations that are not in the records as to what duties, exactly, are included within that job title.  Defendants' argument that Plaintiff's interaction with the population of patients with special needs carries any dispositive weight with respect to the *type* of services Plaintiff provided, and whether in fact they were the type that is included within the scope of "health care services", is without basis.  By this argument, Defendants, just as the Department of Labor argued in the *New York* case, would render each and every one of their employees, and any employees of any employer serving people requiring health care services, as health care providers, even if such employees provided nothing more than administrative services, food services, or any number of other services that are inarguably outside the scope of the type of services required to fit the exception to EPSLA.

Accordingly, Plaintiff submits that the Court should deny Defendants' Motion with respect to his FFCRA claims for interference and retaliation under the proper definition of "health care provider" in effect when his claims arose.  Alternatively, Plaintiff submits that the Court should deny Defendants' Motion at the pleading stage and allow Plaintiff to develop a factual record during discovery to address Defendants' argument that any definition of "health care provider" would encompass Plaintiff's duties, or permit Plaintiff to amend his pleadings to more specifically set forth any allegations necessary for the Court to make such a determination.

### D.  Plaintiff's FAC Sufficiently Alleges Wrongful Discharge Under the PWL

The Pennsylvania Whistleblower law states that:

No employer may discharge, threaten or otherwise discriminate or retaliate against an employee regarding the employee's compensation, terms, conditions, location or privileges of employment because the employee or a person acting on behalf of the employee makes a good faith report or is about to report, verbally or in writing, to the employer or appropriate authority **an instance of wrongdoing or waste by a public body** or an instance of waste by any other employer as defined in this act.

43 Pa. Stat. Ann. § 1423(a).  Wrongdoing is defined as "A violation which is not of a merely technical or minimal nature of a Federal or State statute or regulation, of a political subdivision ordinance or regulation or of a code of conduct or ethics designed to protect the interest of the public or the employer."  § 1422.

In order to establish a *prima facie* case under the PWL, the plaintiff must establish that he (1) made a good faith report of wrongdoing, (2) he was subsequently subjected to an adverse employment action, and (3) there is a causal connection between the employment action and his whistleblowing.  *O'Rourke v. Commonwealth*, 566 Pa. 161, 171 (2001).  Defendants' Motion argues that Plaintiff's PWL claim must be dismissed because (1) Defendant WSI is not a "public body" within the meaning of the PWL, and (2) Plaintiff has failed to allege any "wrongdoing" or

"waste" within the meaning of the PWL.[2]  Neither of these arguments should prevail under the controlling case law, and Defendants' Motion in this respect, as well, should be denied.

With respect to the question of whether Defendant WSI is a "public body", and therefore an employer covered by the PWL, Defendants, at best, are prematurely raising a question of fact before any opportunity to develop a factual record through discovery has occurred.  Defendants' Motion conclusively, and incorrectly, states:

> Here, it is undisputed that the named corporate Defendants are private entities that provide healthcare services to special needs patients.  The PWL is inapplicable to Defendants as a result.  The PWL is for public bodies, not private entities that may or may not receive government assistance such as Medicare or Medicaid.

Defendants' Motion (ECF Doc. No. 9) at p. 20.  Plaintiff most certainly *does* dispute that Defendants are private entities within the meaning of the PWL, as Plaintiff has alleged that Defendants are "entities funded by the Commonwealth of Pennsylvania and/or its subdivisions", thus making Defendants "public bodies" under the PWL.  *See* Plaintiff's FAC (ECF Doc. No. 5) at ¶ 8 (citing *Riggio v. Burns*, 711 A.2d 497, 500 (Pa. Super. 1998) (en banc) (receipt of government funds made hospital a "public body" under the PWL)).

Defendants' reference to Medicaid and Medicare funding is both puzzling, as such allegations do not appear in Plaintiff's FAC, as well as unavailing, as the Pennsylvania Superior Court has specifically held the definition of "public body" within the PWL to include those entities which are "public bodies" because of their receipt of Medicaid funding, and rejection by the Pennsylvania appellate courts of the assertion that any controlling authority exists to bar such substantiation.  *See Denton v. Silver Streaming Nursing and Rehab. Ctr.*, 739 A.2d 571, 576 (Pa. Super. Ct. 1999) ("We find, therefore, that a recipient of Medicaid funding is a "public body" for

---

[2]   Plaintiff does not make any claim based on "waste" under the PWL, thus making Defendants' arguments in this regard moot.

purposes of the Whistleblower Law."); *Riggio*, 711 A.2d at 500 (rejecting the conclusion by courts in the Eastern District of Pennsylvania holding that receipt of Medicaid funding was insufficient to establish that an employer was a "public body" under the PWL); *see also Romer v. MHM Health Professionals*, 2020 WL 6747418, *4 (M.D. Pa. Nov. 17, 2020) (denying dismissal of PWL claim based on defendant's "public body" status as a recipient of funds from the Pa. Dept. of Corrections based on the Pa. Sup. Ct. interpretation of the PWL as a better source of authority for how the Pa. Supreme Court would rule than federal district court opinions dismissing claims based on Medicare/Medicaid funding).

Thus, at most, Defendants have identified an area that the parties must explore through discovery – the source of any funding the corporate Defendants here receive – rather than any basis to dismiss Plaintiff's PWL claim without the opportunity to develop a factual record the Court would need to make any such determination. Accordingly, Defendants' Motion with respect to its argument that the corporate Defendants are not "public bodies" within the meaning of the PWL should be denied, and the parties permitted to conduct discovery on this and all other issues related to Plaintiff's claims.

With respect to Defendants' argument that Plaintiff has not sufficiently alleged "wrongdoing" based on Plaintiff's allegations that he made a good-faith report of Defendants' unlawful conduct in refusing to permit him to quarantine for fourteen days following his positive COVID-19 test. Defendants appear to base their argument on cherry-picked allegations in Plaintiff's FAC that Plaintiff's report of wrongdoing was based only on a "directive" or "guidance" from the Centers for Disease Control ("CDC"), and Defendants assert that such report is "patently insufficient" to demonstrate "wrongdoing" under the PWL. *See* Defendants' Motion (ECF Doc. No. 9) at p. 24. Contrary to this misstatement in Defendants' Motion,

Plaintiff's FAC alleges that (i) Plaintiff told Defendant Kamara that he was required by Defendants' Nurse Practitioner to quarantine for fourteen days following his positive COVID-19 test, as well as guidance from the CDC, and (ii) that this quarantine was required by *both* the CDC and orders issued and in effect at the time of Plaintiff's positive test "by the Pennsylvania Govern and Secretary of the Department of Health".  *See* Plaintiff's FAC (ECF Doc. No. 5) at ¶¶ 23-24.

Defendants' actions, indeed, violated the multiple stay-at-home orders of both Governor Wolf and Secretary Levine, which provided, in relevant part, that while employees of life-sustaining businesses that remained open under the stay-at-home orders were granted a waiver to leave their home to provide such services, these individuals "***must*** employ social distancing practices as defined by the Centers for Disease Control and Prevention."  *See*, *e.g.*, Order of the Sec. of the Pa. Dept. of Health to Stay at Home (attached hereto as "Exhibit A") Dated March 23, 2020; Order of the Governor of the Commonwealth of Pennsylvania for Individuals to Stay at Home (attached hereto as "Exhibit B") Dated March 23, 2020.  Thus, by incorporating the CDC guidance as mandatory practices for individuals permitted to leave their homes during the pendency of these stay-at-home orders, CDC guidance directing individuals exposed to COVID-19 and those testing positive to quarantine for fourteen days following such exposure or positive test was, indeed, a mandatory law in Pennsylvania which Defendants violated, and which violation Plaintiff made a good-faith report of in raising this issue when Defendant Kamara insisted Plaintiff return to work merely six days following his positive COVID-19 test.

Accordingly, Defendants' Motion with respect to Plaintiff's PWL claim should be denied, or, alternatively, the Court should allow Plaintiff to amend his claim to cure any potential deficiencies in the pleading.

**E.  Plaintiff's FAC Sufficiently Alleges All Stated Claims Under the ADA/PHRA**

Defendants' Motion argues that the Court should dismiss Plaintiff's ADA/PHRA claims based on two equally faulty premises: (i) that Plaintiff failed to allege a "disability" within the meaning of the ADA/PHRA; and (ii) that Plaintiff did not engage in protected activity under the ADA/PHRA because his request for leave due to his COVID-19 condition does not constitute a "request for accommodation" under the ADA/PHRA.[3]  Defendants' arguments are equally flawed, and should be rejected.

Disability is defined under the ADA as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such impairment; or (C) being regarded as having such an impairment."  42 U.S.C.A. § 12102(1)(A)-(C).  As this Court explained in *Mills v. Temple Univ.*, 869 F. Supp. 2d 609, 619 (E.D. Pa. 2012), Congress amended the ADA to broaden its scope by expanding the definition of disability, which had been narrowed by Supreme Court interpretation."  *Id.*; *accord, Gardner v. SEPTA*, 410 F. Supp. 3d 723, 735 (E.D. Pa. 2019).  The *Mills* Court further reasoned that:

> With the passage of the ADAAA, Congress expanded the statute's non-exhaustive list of major life activities and declared that **[t]he definition of disability shall be construed in favor of broad coverage of individuals under this Act**, to the maximum extent permitted by the terms of this Act. Major life activities include performing manual tasks, seeing, hearing, eating, sleeping, ... lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working.

---

[3]    Defendants' other assertions in their Motion are all dependent on the Court first agreeing with their propositions above that Plaintiff alleged neither a "disability" nor any protected activity.  *See* Defendants' Motion (ECF Doc. No. 9) at p. 27 (arguing that based on Defendants' argument that Plaintiff did not allege a "disability" under the PHRA, the Court should also dismiss Plaintiff's claim of aiding and abetting discrimination against Defendant Kamara under the PHRA).  Thus, the Court should deny Defendants' Motion with respect to any claim premised on the Court first dismissing Plaintiff's ADA/PHRA claims, as such claims were sufficiently pled in Plaintiff's FAC as argued above.

869 F. Supp. 2d at 620. (emphasis added).

The Court further reasoned that"

> Additionally, the ADAAA requires a less searching analysis of whether a plaintiff is substantially limited. The EEOC has noted that under the ADAAA, substantially limits is not meant to be a demanding standard. Rather, the determination of whether an impairment substantially limits a major life activity requires an individualized assessment, and should require a degree of functional limitation that is lower than the standard for substantially limits applied prior to the ADAAA. **Ultimately, whether an individual is substantially limited as to a major life activity is a question of fact**.

*Id.* at 620-21 (internal citations omitted) (emphasis added).

Under these broadened definitions, it strains comprehension that Defendants would argue, at the pleading stage, that Plaintiff's positive COVID-19 diagnosis does not place him squarely within the ambit of protection under *all three* definitions of "disability" under the ADA/PHRA. They do not – and could not – cite to any controlling legal authority for such a proposition. Given the global devastation, hundreds of thousands of death resulting from COVID-19 and the ever-increasing list of chronic and serious health conditions accompanying COVID-19, this is hardly surprising.

Indeed, only one case cited by Defendants dealt with the amended definitions of the ADA/PHRA, *after* the 2009 amendments broadening the scope of the ADA's definition of "disability". Defendants cite *Koci v. Central City Optical Co.*, 69 F. Supp. 3d 483 (E.D. Pa. 2014) for the argument that the Court should dismiss Plaintiff's ADA/PHRA claim based on the "regarded as disabled" definition because, Defendant contends, Plaintiff's allegation of a COVID-19 diagnosis raises nothing more than a "transitory (expected to last fewer than six (6) months)" impairment. *See* Defendants' Motion (ECF Doc. No. 9 at pp. 26-27) (citing *Koci*, 69 F. Supp. 3d at 486)). However, this Court distinguished *Koci* where, as here, nothing on the face of the claim dispositively forecloses Plaintiff's claim that Defendants *did* perceive Plaintiff as

22

disabled from a condition that was *not* transitory or minor.  *See Cook v. City of Philadelphia*, 94 F. Supp. 3d 640, 645 and n.4 thereto (E.D. Pa. 2015) (denying the defendant's motion to dismiss the plaintiff's "regarded as" ADA claim where the defendant's argument of a "transitory" impairment merely a defense the defendant could raise after development of the factual record at the summary judgment stage).

Similarly, Defendants raise only a premature question of fact with respect to their argument that Plaintiff did not engage in protected activity when he notified Defendants of his positive COVID-19 diagnosis and need for medical leave therefor.  As alleged in Plaintiff's FAC, and similar to the problems inherent in Defendants' attempt to have Plaintiff's FMLA claims dismissed, Defendants utterly failed to engage in any interactive process as required when an employee puts an employer on notice of a medical condition that may require accommodation under the ADA/PHRA.  Had they so engaged, and done anything other than demand Plaintiff show up for work and then immediately terminate him when he was medically unable to do so, the allegations would reflect that further discussion.  Their attempt to now insulate themselves from any legal consequence because of this very failure to engage in the interactive process should be denied, along with their attempt to have the Court prematurely make a dispositive determination of these factual questions without the benefit of full and fair discovery and the development of the factual record.

Accordingly, Defendants' ADA/PHRA arguments merely raise questions of fact which cannot be determined by the Court at this stage, and their Motion with respect to these claims should be denied.  In the alternative, should the Court require more specificity as to any pleading element of these claims, Plaintiff should be given the opportunity to amend and cure any such deficiencies.  Defendants' repeated assertion that such amendment would be "futile" because

Plaintiff has already amended his claims once misstates both the liberal permission required for litigants to cure any pleading deficiencies (*see*, *e.g.*, *Alvin v. Suzuki*, 227 F.3d 107, 121 (3d Cir. 2000) (holding that leave to amend should be granted liberally), as well as the procedural history of this case.  Plaintiff did not amend his original complaint to cure any perceived deficiencies; rather, Plaintiff amended his original complaint to include the now-ripe ADA/PHRA claims following the issuance of the EEOC's right-to-sue letter.  Defendants do not – and could not – demonstrate futility in amending any deficiencies the Court may determine in Plaintiff's FAC. Thus, to the extent that the Court finds any claims in Plaintiff's FAC to be deficient, permission should be granted to permit Plaintiff, for the first time, to cure any such deficiencies rather than foreclose, forever, his opportunity to redress his rights.

## IV.    CONCLUSION

For the foregoing reasons, Plaintiff respectfully requests that the Court deny Defendants' Motion, in its entirety, with prejudice, and permit Plaintiff to litigate the claims in Plaintiff's FAC without further delay.  In the alternative, should the Court determine that any pleading deficiencies are present, Plaintiff respectfully requests permission to amend his claims to cure any such defects.

Respectfully submitted,

**COSTELLO & MAINS, LLC**

By:  *s/ Miriam S. Edelstein*

Dated: December 14, 2020          Miriam S. Edelstein, Esq. (PA204557)
18000 Horizon Way, Suite 800
Mount Laurel, NJ 08057
(Tel.) (856) 727-9700
(Fax) (856) 727-9797
medelstein@costellomains.com

*Attorneys for Plaintiff,*
*Anthony Payne*

24

# EXHIBIT A



# Order of the Secretary of the Pennsylvania Department of Health to Stay at Home

To protect the public from the spread of Coronavirus (COVID-19), it is necessary that all individuals residing in the counties of Allegheny, Bucks, Chester, Delaware, Monroe, Montgomery, and Philadelphia to stay at home or at their place of residence except as needed to access, support or provide life sustaining business, emergency or government services. Therefore, on this day, March 23, 2020, under the authority granted to me by law, I hereby order:

All individuals residing in Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County, and Philadelphia County to stay at home except as needed to access, support or provide life-sustaining business, emergency or government services.   For employees of life-sustaining businesses that remain open, the following child care services may remain open: group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and, part-day school age programs operating under an exemption from the March 19, 2020 business closure Orders. A list of life sustaining businesses that remain open is attached to and incorporated into this Order. In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this order.

Individuals leaving their home or place of residence to access, support or provide life sustaining services for themselves, another person or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities, however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining business, emergency or government services as outlined above.

Enforcement of this Order will commence at 8:00 PM on Monday, March 23, 2020.

COVID-19 is a contagious disease that is rapidly spreading from person-to-person. People infected are capable of exposing others to COVID-19 even if their symptoms are mild, such as a cough.  Additionally, exposure is possible by touching a surface or object that has the virus on it and then touching one's mouth, nose, or eyes.  Spread by persons who are asymptomatic has not been ruled out.

Multiple areas of the United States are experiencing "community spread" of COVID-19, which means that the illness is being transmitted through unknown sources, not from known areas of infection.  Mass gatherings increase the risk of transmission and

community spread.  Case counts of COVID-19 are rapidly increasing throughout many Pennsylvania counties, and are anticipated to continue to appear throughout the Commonwealth.

Symptoms of COVID-19 may include fever, cough, and shortness of breath.  Older adults and people who have serious chronic medical conditions are at a higher risk for serious illness.  Early symptoms may also include chills, body aches, sore throat, headache, diarrhea, nausea/vomiting, and runny nose.

On March 6, 2020, the Governor issued a Proclamation of Disaster Emergency due to the emergence of COVID-19 in the United States and the Commonwealth of Pennsylvania.  Since the Commonwealth of Pennsylvania confirmed its first case of COVID-19, positive cases continue to rise.  As of March 22, 2020, the Commonwealth of Pennsylvania has 479 positive cases of COVID-19 and reports two deaths from the virus.

On March 19, 2020, the Governor and Secretary of Health issued Orders directing the closure of non-life sustaining businesses. Operation of non-life sustaining businesses present the opportunity for unnecessary gatherings, personal contact and interaction that will increase the risk of transmission and the risk of community spread of COVID-19. Similarly, the directive for individuals to stay at home will facilitate the mitigation of COVID-19 by decreasing the opportunities for the transmission of the virus and decrease the risk of community spread.

COVID-19 is a threat to the public's health, for which the Secretary of Health may order general control measures, including, but not limited to, closure, isolation, and quarantine.  This authority is granted to the Secretary of Health pursuant to Pennsylvania law.  *See* Section 5 of the Disease Prevention and Control Law, 35 P.S. §§ 521.1; 521.5, sections 2102(a) and 2106 of the Administrative Code of 1929, 71 P.S. § 532(a) and 536 and the Department of Health's (Department) regulations found at 28 Pa. Code §§ 27.60-27.68 (relating to disease control measures; isolation; quarantine; movement of persons subject to isolation or quarantine; and release from isolation and quarantine).  Particularly, the Department has the authority to take any disease control measure appropriate to protect the public from the spread of infectious disease.  *See* 35 P.S. §§ 521.5; 71 P.S. § 532(a), and 1402(a); 28 Pa. Code § 28.60.  The Department determines that the appropriate disease control measure based upon COVID-19, the manner of its spread in the Commonwealth and in the world, and its danger to Pennsylvanians, is for individuals residing in the Commonwealth to stay at home except to obtain life-sustaining services for themselves or others as outlined in this order to prevent and control the spread of disease.

Accordingly, the order and directive for individuals residing in the Commonwealth to stay at home is necessary to protect the public's health.  This Order shall take effect immediately and remain in full force and effect for a period of two weeks, specifically until April 6, 2020.

_____
Rachel Levine, MD
Secretary of Health

# EXHIBIT B



COMMONWEALTH OF PENNSYLVANIA

OFFICE OF THE GOVERNOR

*ORDER OF*

*THE GOVERNOR OF THE COMMONWEALTH OF PENNSYLVANIA*

*FOR INDIVIDUALS TO STAY AT HOME*

**WHEREAS,** the World Health Organization and the Centers for Disease Control and Prevention ("CDC") have declared a novel coronavirus ("COVID-19") a "public health emergency of international concern," and the U.S. Department of Health and Human Services ("HHS") Secretary has declared that COVID-19 creates a public health emergency; and

**WHEREAS,** as of March 6, 2020, I proclaimed the existence of a disaster emergency throughout the Commonwealth pursuant to 35 Pa. C.S. § 7301(c); and

**WHEREAS,** I am charged with the responsibility to address dangers facing the Commonwealth of Pennsylvania that result from disasters. 35 Pa. C.S. § 7301(a); and

**WHEREAS,** in addition to general powers, during a disaster emergency I am authorized specifically to control ingress and egress to and from a disaster area and the movement of persons within it and the occupancy of premises therein. 35 Pa. C.S. § 7301(f); and

**WHEREAS,** in executing the extraordinary powers outlined above, I am further authorized during a disaster emergency to issue, amend and rescind executive orders, proclamations and regulations and those directives shall have the force and effect of law. 35 Pa. C.S. § 7301(b); and

**WHEREAS,** in addition to my authority, my Secretary of Health has the authority to determine and employ the most efficient and practical means for the prevention and suppression of disease. 71 P.S. § 532(a), 71 P.S. 1403(a); and

**WHEREAS,** these means include isolation, quarantine, and any other control measure needed. 35 P.S. § 521.5.

**NOW THEREFORE,** pursuant to the authority vested in me and my Administration by the laws of the Commonwealth of Pennsylvania, I do hereby ORDER and PROCLAIM as follows:

*Section 1: Order to Stay at Home*

All individuals residing in Allegheny County, Bucks County, Chester County, Delaware County, Monroe County, Montgomery County, and Philadelphia County are ordered to stay at home except as needed to access, support, or provide life sustaining business, emergency, or government services. For employees of life sustaining businesses that remain open, the following child care services may remain open: group and family child care providers in a residence; child care facilities operating under a waiver granted by the Department of Human Services Office of Child Development and Early Learning; and, part-day school age programs operating under an exemption from the March 19, 2020 business closure Orders.

*A list of life sustaining businesses that remain open is attached to and incorporated into this Order. In addition, businesses that are permitted to remain open include those granted exemptions prior to or following the issuance of this Order.*

*Individuals leaving their home or place of residence to access, support, or provide life sustaining services for themselves, another person, or a pet must employ social distancing practices as defined by the Centers for Disease Control and Prevention. Individuals are permitted to engage in outdoor activities; however, gatherings of individuals outside of the home are generally prohibited except as may be required to access, support or provide life sustaining services as outlined above.*

*Enforcement of this Order will commence at 8:00 PM on Monday, March 23, 2020.*

*Section 2: Effective Date and Duration*

*This order is effective immediately and will remain in effect for a period of two weeks, specifically until April 6, 2020.*



*GIVEN under my hand and the Seal of the Governor, at the city of Harrisburg, on this twenty-third day of March two thousand twenty, the year of the commonwealth the two hundred and forty-fourth.*

*TOM WOLF*
*Governor*